Smith, J.
(concurring). While I agree with the majority that reversal of defendant’s conviction is not required, I write separately because I cannot agree that the trial court did not err in its treatment of Gourdin Heller’s testimony "in any respect” (majority opn, at 542). Notwithstanding the errors below, given the overwhelming evidence of defendant’s guilt, the trial court’s errors were harmless and I would affirm the order of the Appellate Division.
I.
Defendant attended a "keg” party on June 1,1991 with Gourdin Heller and several other friends from his neighborhood, at a house on Atlantic Beach, Long Island. The party was attended by as many as 250 young people, mostly of high school and college age. Jermaine Ewell also attended the party with several of his friends, as well as his girlfriend Nicole Diamond. Diamond had dated the defendant prior to dating Ewell.
At some point during the party, defendant conversed briefly with Nicole Diamond. The substance of their conversation is disputed. However, it was Diamond’s understanding that defendant made a racial slight towards Ewell, who is African-American, and Diamond relayed that slight to Ewell. Ewell confronted defendant and defendant denied making any statement, racial or otherwise about Ewell. As a crowd began to form, heated comments were exchanged between friends of both defendant and Ewell, and ultimately the party broke up. As defendant and his friends left the party, they were chased by Ewell and his friends.
Defendant and his friends returned to their cars and, without Gourdin Heller, left the scene and met at a local gas station. The group discussed the events of the party and decided to return to the boardwalk near where the party had been lo *547 coted. The group left the gas station, proceeded to defendant’s house to get bats and sticks and went to the Atlantic Beach boardwalk.
Ewell was apparently attacked by defendant and his friends with the sticks and bats they obtained from defendant’s house. Ewell was hit in the head with either a bat or a stick and rendered unconscious. He sustained severe injuries and head trauma. Several other young men at the beach, both friends of defendant, attempted to assist Ewell, but were similarly attacked by defendant and his friends and beaten. Defendant and his friends fled the scene.
Defendant was convicted, after a jury trial, of first degree assault, second degree assault, fourth degree conspiracy, second degree riot and fourth degree criminal possession of a weapon in connection with his participation in the incident on the beach. At trial, defendant’s main witness, Gourdin Heller, corroborated defendant’s version of the facts. Heller testified on direct examination that after the confrontation between defendant and Ewell, defendant and his friends left the party and walked towards their cars. Heller further testified that as defendant and his friends were at their cars, Ewell and his friends came within 50 yards of defendant and his friends, carrying bottles and holding their fists in the air. It was Heller’s testimony that he and defendant agreed to meet at the boardwalk if they became separated. After defendant and defendant’s friends went to their cars, Heller testified that Ewell and Ewell’s friends chased defendant’s car down the street. At no time, Heller testified, did he hear either defendant or any of his friends yell racial slurs at Ewell or. his friends.
On cross-examination, the prosecution confronted Heller with Grand Jury testimony which contradicted Heller’s testimony during direct examination. Heller alleged that he had been pressured when he gave Grand Jury testimony by the officer investigating the beach incident. Heller stated that because he was already on probation, the officer coerced him into making statements that were not true.
The trial court intervened and after a bench conference, called a recess. Outside of the jury’s presence, the trial court advised Heller of the potential risks accompanying the commission of perjury, advised him of his right to counsel, and ap *548 pointed, counsel to represent Heller.[1] After consulting with his client, Heller’s counsel indicated to the court that Heller would invoke the Fifth Amendment privilege against self-incrimination as to any questions regarding the events of June 1, 1991.
Defense counsel argued that a break in the trial to allow Heller to consult with an attorney regarding his conflicting testimony, essentially "regroup”, and then invoke his Fifth Amendment privilege regarding the events of June 1, 1991, would be too prejudicial to the defendant’s case and that the court should not allow Heller to testify any further. In the alternative, defense counsel argued that it should have the opportunity to conduct a redirect examination of Heller for the purpose of inquiring about material other than the events of June 1, 1991. The People argued that they should be allowed to finish questioning Heller regardless of whether he invoked his Fifth Amendment privilege and that any prejudice that inured to defendant was his own making because defendant had called Heller as a witness.
On advice of counsel, Heller chose not to testify and asserted his Fifth Amendment privilege when questioned on cross-examination.[2] Over defendant’s objection, the court instructed *549 the jury that an adverse inference could be drawn from Heller’s invocation of his Fifth Amendment right against self-incrimination. Specifically, the court charged:
"You will recall that Gourdin Heller and Patrick Keon, while testifying, refused to answer questions upon the grounds that the answers might incriminate them. Our law provides that no person shall be compelled to be a witness against himself. That right is guaranteed to all persons and the mere fact that a witness invokes his right does not give rise to any inference. However, you may consider it on the issue of witness’ credibility.”
Also testifying for the prosecution were many of the young people present at the boardwalk on the night of June 1, 1991. Many of these witnesses were close friends of the defendant. Some witnesses knew Jermaine Ewell although they were not friends with him, and others did not know Jermaine Ewell.[3]
*550 n.
"[A] witness’ refusal to testify on constitutional grounds does not, in and of itself, have any real probative significance, although it may have a disproportionate impact upon the minds of the jurors and may tend to create the impression that the witness is guilty of a particular crime” (People v Thomas, 51 NY2d 466, 472). We have recognized that the trial court has a duty to intercede when there is a danger that a jury may draw an unwarranted inference against either the defendant or the People from a witness’ refusal to testify. To combat this danger we have provided that:
"the trial court should, upon request, give the jurors a neutral instruction advising them that the witness has become unavailable for reasons beyond the defendant’s control and that, consequently, no adverse inferences may be drawn from the witness’ failure to appear” (Thomas, 51 NY2d, at 473-474, supra; see also, People v Berg 59 NY2d 294).
Because a witness’ decision to take the Fifth has no "real probative significance,” neither the People nor the defendant should benefit from any unwarranted inferences that a jury might draw from it. Thus, Federal courts and other jurisdictions have held that jurors are not entitled to draw any inference from invocation of the privilege against self-incrimination, not even as to credibility (see, e.g., United States v Nunez, 668 F2d 1116, 1123 [defendant’s request for charge that jury could consider prosecution witness’ refusal to testify as to the witness’ credibility was properly denied, since it is inappropriate for the jury to draw any inference]; Bell v State, 614 So 2d 562, 564 [Fla] [court’s denial of defense request for instruction that jury could draw adverse inference as to credibility from prosecution witness’ invocation of Fifth Amendment was proper]).
Here it was the defense who called Heller. That, however, does not alter the fact that Heller’s refusal to testify on Fifth Amendment grounds was not probative as to his credibility or otherwise. To be sure, whether a party deliberately called a witness knowing he or she would refuse to testify or whether a defendant’s confrontation rights were infringed are factors relevant to whether the objectionable and unwarranted inferences arising from assertion of the privilege were prejudicial to the defense or the prosecution (see, People v Berg, 59 NY2d 294, supra [courts must determine whether allowing prosecution to call witness solely to invoke privilege in presence of *551 jury outweighed possible prejudice to the defendant from the unwarranted inferences that may he drawn]). Regardless of who called the witness or whether a defendant’s confrontation rights are implicated, the premise acknowledged in Thomas— that a witness’ decision to refuse to testify on self-incrimination grounds has little probative significance — is controlling here. We have never held that a trial court may affirmatively charge the jury that a witness’ invocation of the Fifth Amendment as to noncollateral matters may be considered for any purpose. Consequently, the trial court erred when it instructed the jury that Heller’s invocation of the Fifth Amendment could be considered on the issue of Heller’s credibility.
Moreover, Heller’s refusal to testify did not merely go to the question of Heller’s credibility as a witness or to collateral matters. Heller testified to the events of June 1, 1991 stating a chronology which favored the defendant and differed from other witness’ recollections of the events. As the majority notes, Heller was an "important defense witness.”
The majority’s reliance on United States v Cardillo (316 F2d 606, cert denied 375 US 822) in this regard is misplaced. In Cardillo, the Second Circuit explained that a jury instruction, as opposed to striking the direct testimony, is appropriate where the witness’ answer would have related to collateral matters concerning credibility (compare, 1CJI[NY] 7.14, at 289 [where defense witness invokes privilege solely as to collateral matters, court should charge jury that "since the questions relate solely to his own credibility as a witness, you may take into consideration his refusal to answer such questions in determining, as you may with all witnesses, to what extent you believe his testimony and how much weight you wish to give his testimony”], with 1 CJI[NY] 7.14, at 291 [where defense witness invokes privilege as to noncollateral matters, jury should be instructed to draw no inference whatsoever or to speculate as to what the witness’ answers might have been]).
Heller did not invoke the Fifth Amendment in response to a collateral matter, such as crimes or other bad acts which Heller may have committed and which would reflect badly on his credibility as a witness. Heller invoked the Fifth Amendment in response to the threat of perjury proceedings because of substantive differences between his trial testimony and Grand Jury testimony. The trial court’s charge that the jury could draw a negative inference against Heller, because Heller exercised his privilege against self-incrimination, permitted *552 the jury to infer that Heller lied during direct examination and that the differing versions given by other witnesses was the truth. Despite the majority’s conclusion to the contrary, the trial court’s instruction negatively affected the defendant.
The majority notes that the trial court "properly charged” the jury not to draw any inferences on the merits of the case (majority opn, at 545). However, the charge is worded ambiguously. The jury was instructed that "the mere fact that a witness invokes his [Fifth Amendment] right does not give rise to any inference.” In the next sentence, the jury is told, "However, you may consider it on the issue of witness’ credibility.” The trial court never explicitly instructed the jurors not to draw any inference on the merits of the case or against the defendant as a result of the Heller’s exercise of the privilege against self-incrimination. Moreover, in the absence of a specific instruction not to draw any inferences, a jury may draw a negative inference against a defendant’s credibility, especially in a case where the defendant has also refused to testify, because the jury has been permitted to draw a negative inference against other witness’ refusals to testify. However, because the defendant did not invoke the Fifth Amendment here, and because of the overwhelming evidence of defendant’s guilt, the trial court’s error was harmless.
The majority contends that because the People were entitled to strike Heller’s direct testimony, defendant should not be heard to complain about the court’s charge, which it describes as a "less drastic remedy.” The charge authorized the jury to make an inappropriate inference from Heller’s assertion of his privilege not to testify. The erroneous nature of the court’s instruction was not mitigated by the fact that Heller’s direct testimony was allowed to stand.
The prosecutor’s comments on Heller’s invocation of the privilege against self-incrimination were also improper because a witness’ exercise of the Fifth Amendment has no probative value and the defendant should not be penalized because a witness has exercised a constitutionally protected right. Moreover, pointed and repeated references to a witness’ failure to testify may create a spillover effect and prejudice a defendant in a case where the defendant has also failed to testify. Defendant’s right to remain free from any comments or inferences resulting from his invocation of the Fifth Amendment privilege against self-incrimination would be eroded as a result.
*553 Judges Simons, Bellacosa and Ciparick concur with Judge Levine; Judge Smith concurs in result in a separate opinion in which Chief Judge Kaye and Judge Titone concur.
Order affirmed.

. The colloquy between Heller and the court was as follows:
"Q: Mr. Heller, you’ve been asked a series of questions.
"A: Yes, I have.
"Q: And you are under oath now and you, of course, realize that?
"A: Yes.
"Q: And you were under oath before a Grand Jury when you testified?
"A:Yes.
"Q: There seems to the court to be a basic inconsistency in certain answers you gave under oath in the Grand Jury and under oath in this proceedings.
"A: Yes.
"Q: There is a crime called perjury.
"A: Right.
"Q: It is a felony and a very serious matter and I feel it is my obligation right now to advise you. Do you want a lawyer to represent you at this stage of the proceeding?
"A: I don’t know. I don’t know. I’m just here to tell the truth; you know what I mean?
* * *
"Q: You realize that any thing you do say can be used against you; do you understand that?
"A: Yes, I do. * * *
"Q: Do you want to discuss this with an attorney.
"A: Yes, I’d like to.”

. When questioned by counsel for the People, Heller responded as follows:
*549 "Q: Mr. Heller, did you testify in your direct examination on Tuesday that you saw Shannon Siegel take a stickball bat out of his car at the party?
"A: On advise [sic] of counsel I refuse to answer that question on the grounds that it may incriminate me.
"Q: I asked if you saw Shannon Siegel take a bat out of the trunk of the car?
"A: On advise [sic] of counsel I refuse to answer that question on the grounds that it may incriminate me.
"Q: Mr. Heller, did you testify on your direct-examination that before Shannon Siegel drove away from the party, that he told you if anything happens, that you should meet him at the boardwalk?
"A: On the advise [sic] of counsel I refuse to answer that question on the grounds that it may incriminate me.
"Q: Did you testify on direct-examination that after Mr. Siegel drove away, you, Pat Keon and Dennis Tveter went to the west end of the boardwalk to the Sunny Atlantic Beach Club?
"A: On the advise [sic] of counsel I refuse to answer that question on the grounds that it may incriminate me.
"Q: Mr. Heller, do you intend to invoke your 5th Amendment privilege with respect to any question that is asked?
"A: Yes.”

. Janine DeCandia and Jennifer Levy testified that although they knew both defendant and Ewell, they considered themselves good friends with the defendant. Andrew Schneider, who had known defendant since elementary school and had never laid eyes on Ewell before the night of the incident, also testified for the prosecution. Antonio Franzese, Stephen Lieberman and Daniel Ligorner all attended high school with the defendant and also considered themselves good friends with him, but testified for the prosecution that defendant was with the group of teens that attacked Ewell on the boardwalk.